UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------

GAIL KEYES,

                              Plaintiff,          <u>MEMORANDUM</u>
                                                  <u>& ORDER</u>
            - against -
                                                  Civil Action No.
AMERICAN AIRLINES, INC., AMR CORP.,               CV-00-4480
and AMR EAGLE HOLDING CORP.,                      (DGT)(MDG)

                              Defendants.

-------------------------------------------------------- x

Trager, J.:

        Plaintiff Gail Keyes ("Ms. Keyes" or "plaintiff") commenced
this action against defendants American Airlines, Inc., AMR
Corporation., and AMR Eagle Holding Corp. (collectively
"American" or "defendants") to recover $5,000,000 with interest
for injuries arising from defendants' alleged failure to warn
passengers of pre-existing unsafe conditions and their attempts
to conceal and cover up those defects.  American has moved for
summary judgment pursuant to Fed. R. Civ. P. 56, arguing that
American breached no duty of care to plaintiff and requesting a
dismissal as a matter of law.  American also moves to preclude
the report and testimony of Charles R. Manning III, P.E., based
on the criteria set forth in Rule 702 of the Federal Rules of
Evidence.

**Background**

On February 24, 1998, plaintiff and her husband, William Keyes ("Mr. Keyes"), traveled on a Boeing 767-200 aircraft on an American Airlines flight from John F. Kennedy International Airport, New York to San Diego, California. (<u>See</u> Declaration of Tania M. Torno ("Torno Decl."), Ex. C. ¶¶ 22-23; Ex. D; Ex. E at 32-33; Ex. F. at 16.) The plaintiff and her husband boarded the aircraft without incident and proceeded to their seats in the coach class section. (Torno Decl., Ex. E at 49, 51-52.) Plaintiff's husband sat in an aisle bulkhead seat with a galley across the aisle and plaintiff sat directly to his right. (<u>Id.</u> at 48-50.) Plaintiff did not not recall getting up from her seat at any time during the flight. (<u>Id.</u> at 54.)

The plane arrived in San Diego on or about the early morning hours of February 25, 1998. (<u>Id.</u> at 33.) As she disembarked the aircraft, plaintiff tripped and fell across the aisle adjacent to their seats. (<u>See</u> Defendants' Rule 56.1 Statement ("Defs.' 56.1 Stmt.") ¶ 6; Torno Decl., Ex. E at 54-55.) Her right hip came into contact with the floor of the airplane and her upper torso extended into the galley. (Torno Decl., Ex. E at 58; Ex. F at 45.)

The fall occurred as plaintiff began "sidestepping" out of the seat aisle and her right foot "caught something." (<u>Id.</u> at

54, 72, 74.) Plaintiff did not see what she had tripped over. (Torno Decl., Ex. E at 75-77; Ex. G at 6, 8.) Although plaintiff testified in her deposition that her husband was standing in front of his seat and facing her as she sidestepped into the aisle (<u>See</u> Torno Decl., Ex. E. at 55-56), plaintiff's husband testified that he did not observe her fall because he was getting a bag out of the overhead bin and had his back to her. (<u>See</u> Defs.' 56.1 Stmt. ¶ 8, Torno Decl., Ex. F at 34, 43- 44; Ex. H at 6.)

The record contains inconsistent allegations as to what caused plaintiff's fall. In her original complaint, plaintiff claimed that she fell over an unspecified "raised and defective condition" that was covered with large pieces of tape. (<u>See</u> Torno Decl., Ex. A ¶¶ 29-30.) In her first and second amended complaints, plaintiff removed the duct tape reference and alleged that her fall was due to an unspecified "raised and defective condition." (<u>See</u> Torno Decl., Ex. B ¶ 22; Ex. C ¶ 22); <u>see also</u> Defs.' Ex. I.) In her deposition testimony, plaintiff asserted that her right foot "got caught in this thing in between the aisle and my seat." (<u>See</u> Torno Decl., Ex. E at 57.) The object which her right foot was caught on "felt like a strip, some kind of strip on the ground . . . that was raised . . . on the floor . . . . it was something like a plastic or something." (<u>Id.</u> at 72-73.) Plaintiff's husband also testified that when he first

embarked on the aircraft he saw "two metal strips" which "seemed
to go the full length of the aircraft." (Torno Decl., Ex. F at
22-23.) One strip, which ran alongside the outside of his seat,
had a slot going down its entire length. (Id. at 59-60.) Mr.
Keyes further testified that the strip was raised between a
quarter of an inch and a half inch, and was about three-quarters
to a half an inch wide. (Torno Decl., Ex. F at 58-59, 61). Mr.
Keyes recalled wondering to himself "whether the seats fastened
into it." (Id. at 58-59.) After plaintiff fell, Mr. Keyes
looked in the area of the fall and again noticed the strip on the
floor, but he did not see his wife trip over that strip. (Id. at
62.)

To support her position that a metal strip on the floor of
the aircraft caused her to fall, plaintiff retained Charles R.
Manning III, P.E. ("Manning"), a proposed expert in accident
reconstruction. In a two-page report dated January 10, 2003 to
plaintiff's counsel, Manning states that on November 19, 2002 at
John F. Kennedy International Airport he examined the Boeing 767-
200 aircraft in which the incident occurred. (Torno Decl., Ex.
J.) During this examination, he documented and photographed the
area in question, which American Airlines personnel reported had
not been modified since the incident. (Id.) Manning's report
also relies on "available documents," the Keyes' deposition
testimony and statements made by the Keyes after they reviewed

4

Manning's photographs of the aircraft. (Id.) Manning states that the "only thing on the floor in the area where Mr. and Ms. Keyes suggest she was exiting the seat row would be the seat mounting track." (Id.) Manning further notes that this seat mounting track was covered with a plastic cover, and states that "[t]he purpose of this cover would be to minimize the probability of individuals tripping over an exposed mounting track." (Id.) According to Manning, the Keyes reported that the seat mounting cover was not installed at the time of the incident, but "no physical evidence is available to confirm these statements." (Id.) Manning then concludes: "If the seat mounting track cover was missing as described by the Keyes, this would be the more likely source for initiating the trip. An individual could still possibly trip with the cover in place, but it would be less likely, since the cover has been designed (widened and rounded) to minimize the potential for tripping." (Id.)

Prior to plaintiff's fall, neither she nor her husband complained to American personnel of any defective or unsafe condition on the aircraft. (See Torno Decl., Ex. E at 73; Ex. F at 48, 57.) Immediately after she fell, several flight attendants came over to plaintiff and asked if she needed to go to the hospital or receive other medical attention, but plaintiff refused. (Torno Decl., Ex. E at 69-71.) The flight attendants also informed plaintiff that an authorized employee was not at

the gate to fill out an accident report on her behalf, but that she could call a number to submit an accident report. (Id. at 69-70.) The flight attendants also offered a wheelchair, which she initially declined but later requested after exiting the aircraft with her husband's assistance. (Id. at 71, 80-82.) Although plaintiff used the wheelchair to go outside the airport, she did not use a wheelchair or a cane, nor seek medical assistance during her stay in San Diego. (Id. at 83-84, 95, 97.) While in San Diego, plaintiff did not file an accident report with American. (Id. at 98.)

When plaintiff checked in for her return flight to New York five days later, she spoke with Keith James ("James"), an American employee at the San Diego airport, about the incident. (Id. at 44, 96.) After plaintiff told James that she had fallen on her arrival to San Diego, James upgraded her ticket to a first-class seat on the return flight to New York, gave her his business card, and instructed her to call his office on Monday because he did not have a blank accident report for her to fill out. (Id. at 98.)

Sometime after she returned from New York, plaintiff called James's office and spoke to his secretary. (Id. at 104.) When plaintiff requested an accident report form, the secretary told her that a representative from the insurance company would call her on Monday of the following week. (Id.) However, no one ever

called plaintiff; nor did plaintiff follow up on her request to receive this form or send any written requests to American. (<u>Id.</u> at 105.)

Immediately after her fall in the aircraft, plaintiff reportedly had a bruise and some pain in her right hip, and had trouble sitting during her stay in San Diego. (<u>Id.</u> at 110-11.) After her return to New York, the pain decreased, but when plaintiff resumed teaching, she occasionally experienced back pain at work. (<u>Id.</u> at 103, 111.) In May or June of 1998, plaintiff went to the emergency room at Long Island Jewish Hospital complaining of severe pain from her waist down.[1] (<u>Id.</u> at 103, 108.) Plaintiff told her examining doctors that she might have been bitten by a deer tick and had lifted heavy books regularly as a teacher. (<u>Id.</u> at 122-23.) After the visit, plaintiff underwent physical therapy on two or three occasions and was also given a prescription for Naproxyn. (<u>Id.</u> at 126-27, 129, 154-55.) On March 29, 1999, plaintiff went to the emergency room for blurred version. (<u>Id.</u> at 143-44.) In September 1999, plaintiff was involved in a car accident in a parking lot and

---

[1] While plaintiff testified that she was first treated for back pain during an emergency room visit in May or June 1998, plaintiff was presented with a record from Long Island Jewish Hospital indicating an emergency room visit on August 19 for severe lower back pain. (Torno Decl., Ex. E at 119.) Moreover, when asked whether she had sought treatment from any physician for her lower back pain prior to this date, plaintiff said she could not recall whether she had. (<u>Id.</u> at 120.)

sought medical help in January 2000 for pains in her left hand, arm, shoulder, and neck.  (Id. at 172-75, 181).  Plaintiff also recalled sweeping snow with a broom in January 2000 and feeling "a click" in her back which was noted in a doctor's report in January 2000.  (Id. at 168-71, 179.)  As plaintiff's back pain continued to persist, a physician recommended that plaintiff undergo surgery to avoid potential permanent nerve damage in her legs. (Id. at 188-89.)  An MRI dated January 28, 2000 revealed an L4, 5 disk herniation to the left side of the foramen, and a disk fragment which had migrated and hit a nerve.  (See Affirmation of Mark S. Zemcik ("Zemcik Aff.") Ex. 2 at 19.)  To remove the disk fragment, on May 24, 2000, plaintiff underwent a spinal surgery called hemilaminectomy with disketomy and exploration of the left L4 nerve.  (Id. at 22.)  Dr. Jeffrey Spivak, the doctor who performed the surgery, had no opinion as to what had caused plaintiff's injury.  (Id. at 25.)

On August 2, 2000, plaintiff commenced the instant suit. Following the discovery period, defendants filed a motion for summary judgment on September 4, 2003.  On September 17, 2004, plaintiff, with the court's permission, made a limited discovery request for "all maintenance, repair or other records concerning the seat tracks and seat track mounting covers for the subject aircraft."  (Letter from Mark S. Zemcik to the Court (Sept. 17, 2004).)  One week later, on September 24, 2004, the court denied

the defendants' motion, but gave leave to renew after American
had complied with plaintiff's request for the maintenance and
repair records.  During a status conference held on April 8,
2005, the defendants sought to renew their summary judgment
motion.  The court again reserved decision, and ordered American
to produce, if available, daily records of repairs made on the
aircraft in the time surrounding the accident.  (Minute Entry for
Status Conference of April 8, 2005.)  If no records were
available, American was ordered to provide an explanation of its
document retention policies.  (Id.)  On July 22, 2005, defendants
submitted the affidavit of Danny B. Hodge, Managing Director of
Quality Assurance and Chief Inspector for American Airlines,
stating that records responsive to the court's order did not
exist, and previously existing records, if any, were destroyed
prior to the filing of plaintiff's lawsuit.  (See Aff. Of Danny
B. Hodge ("Hodge Aff.") ¶¶ 3, 11-12.)  Plaintiff has not
responded to this most recent submission by the defendants.

## Discussion

### (1)

### Choice of Law

This court's subject matter jurisdiction is predicated on
diversity of citizenship.  Accordingly, New York's choice of law
rules will govern and might lead to the application of another

state's substantive law.  <u>3Com Corp. v. Banco Do Brasil, S.A.</u>,
171 F.3d 739, 743 (2d Cir. 1999).  However, in this case, the
parties' briefs rely exclusively on New York substantive law.
Because "the parties have agreed to the application of the forum
law, their consent concludes the choice of law inquiry," and New
York law, therefore, applies to this action.  <u>Id</u>. (quoting
<u>American Fuel Corp. v. Utah Energy Dev. Co</u>., 122 F.3d 130, 134
(2d Cir. 1997)); <u>see also</u> <u>Krumme v. WestPoint Stevens Inc</u>., 238
F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that
New York law controls, and such 'implied consent . . . is
sufficient to establish choice of law.'").

**(2)**

**Admissibility of Manning's Expert Opinion**

American moves to preclude the expert testimony and report
of plaintiff's proposed expert, Charles R. Manning, III, P.E.,
pursuant to Rules 702 and 402 of the Federal Rules of Evidence.
(<u>See</u> Defs.' Mem. at 21-26).

Admission of expert testimony is governed by Rule 702 of the
Federal Rules of Evidence:

> If scientific, technical or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if
> (1) the testimony is based upon facts and data,
> (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has

10

applied the principles and methods reliably to the
facts of the case.

Fed. R. Evid. 702.

Rule 702 assigns to the district court the "gatekeeping"
task of "ensuring that an expert's testimony both rests on a
reliable foundation and is relevant to the task at hand."
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597
(1993).  Moreover, Rule 702 applies not only to scientific
testimony but also to expert testimony based on technical or
other specialized knowledge.  Kumho Tire Co. v. Carmichael, 526
U.S. 137, 147 (1999).

In assessing whether a proffered expert's testimony rests on
a reliable foundation, a district court's inquiry must focus not
on the substance of the expert's conclusions, but on whether
those conclusions were generated by a reliable methodology.
Daubert, 509 U.S. at 590.  To assist district courts in making
this preliminary assessment, the Supreme Court enumerated four
non-exclusive factors for determining whether an expert opinion
is reliable: (1) whether the expert's conclusions have been
tested or are testable; (2) whether the expert's conclusions have
been published and subjected to peer review; (3) in the case of a
scientific technique, the potential or known error rate; and
(4) whether the expert's conclusions have gained general
acceptance in the relevant scientific community.  Id. at 593-94.
Although the district court must focus on principles and

methodologies employed by the expert and not on the expert's conclusions, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Donnelly v. Ford Motor Co.</u>, 80 F. Supp. 2d 45, 48 (E.D.N.Y. 1999) (quoting <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997)). Furthermore, the reliability test is "a flexible one," and the <u>Daubert</u> factors are not a "definite checklist or test" but must be tailored to the facts of the particular case. <u>Donnelly</u>, 80 F. Supp. 2d at 48 (quoting <u>Kumho Tire</u>, 526 U.S. at 150).

The second part of the district court's gatekeeping role is "to determine whether an expert's testimony is 'relevant to the task at hand,' namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." <u>Donnelly</u>, 80 F. Supp. 2d at 49 (quoting <u>Daubert</u>, 509 U.S. at 592-93). In other words, the expert's testimony "must not only be reliable, but it must be relevant in that it 'fits' the facts of the case." <u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at 591-92). "A proffered expert opinion may fail to meet the fit requirement if it relates to 'facts or data that have not been adequately established in the case.'" <u>Amorgianos v. Nat'l</u>

Railroad Passenger Corp., 137 F. Supp. 2d 147, 163 (E.D.N.Y.
2001) (quoting Fed. Jud. Ctr., Reference Manual on Scientific
Evidence 47 (1994)), aff'd, 303 F.3d 256 (2d Cir. 2002).

Plaintiff has failed to meet her burden of showing that
Manning's report satisfies the requirements of Rule 702.
Manning's opinions are unreliable because he did not attempt to
reconstruct how the accident occurred, let alone gather
sufficient physical evidence to support his theory that the seat
mounting track may have caused plaintiff to trip.  First, Manning
seems to rely primarily on unnamed "available documents," his on-
site inspection of the incident aircraft, and the Keyes'
deposition testimony.  The report contains no measurements,
detailed physical descriptions nor other facts to corroborate the
Keyes' vague description of the "raised metal strip" on which
plaintiff allegedly tripped.  Manning himself admits that "[n]o
physical evidence is available to confirm [Mr. Keyes']
statements."  Secondly, although Manning asserts that "[t]he
purpose of the [plastic] cover would be to keep material from
getting trapped in the seat mounting tracks and to minimize the
probability of individuals tripping over an exposed mounting
track," this assumption is completely without support.  Finally,
as American points out, Manning's conclusion speculates that an
individual could trip with or without any plastic cover in place:
"If the seat mounting track cover was missing . . . this would be

the more likely source for initiating the trip. An individual

could still possibly trip with the cover in place, but it would

be less likely . . . ." The purported likelihood of tripping

both with and without the cover in place remains unsupported and

untested by any scientific or technical methodology, if any were

at all employed by Manning during his investigation.

Additionally, Manning's report is devoid of any reference to

industry standards or regulations with respect to seat mounting

tracks, thus making it unclear whether American even deviated

from any established standards or regulations in allegedly

leaving the seat mounting track exposed at the time of

plaintiff's incident.

Although neither party raises this point, it also should be

noted that Manning's expert report is neither a sworn nor

verified document. Because an unsworn statement is not

sufficient to defeat a motion for summary judgment, Manning's

report cannot be considered in connection with American's motion.

Demars v. O'Flynn, 287 F. Supp. 2d 230, 242 (W.D.N.Y. 2003)

(citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n.17

(1970)); see also Chaiken v. VV Publ'g Corp., 119 F.3d 1018,

1032-33 (2d Cir. 1997) (finding unsworn "expert" letters

submitted by opposing party insufficient to meet requirements of

Fed. R. Civ. P. 56 and withstand motion for summary judgment).

**Negligence**

American asserts that it cannot be held liable for
plaintiff's injuries because plaintiff has failed to state a
prima facie case of negligence.  In order to establish a *prima
facie* case of negligence under New York law, a plaintiff must
prove that: (1) the defendant owed a cognizable duty of care to
him or her; (2) the defendant breached that duty; and (3)
plaintiff suffered injury as a proximate result of that breach.
Stagl v. Delta Airlines, 52 F.3d 463, 467 (2d Cir. 1995) (citing
Solomon v. City of New York, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d
392, 392, 489 N.E.2d 1294, 1294 (1985)).

With respect to the first element of plaintiff's prima facie
negligence claim, American, as a common carrier, owes a duty to
its passengers to take reasonable care under the circumstances in
ensuring the safety of its aircraft cabins.  See Bethel v. New
York City Transit Auth., 92 N.Y.2d 348, 356, 703 N.E.2d 1214,
1218, 681 N.Y.S.2d 201, 205 (1998) ("[W]e conclude that the rule
of a common carrier's duty of extraordinary care is no longer
viable.  Rather, a common carrier is subject to the same duty of
care as any other potential tortfeasor – reasonable care under
all of the circumstances of the particular case.").  See also
Stagl, 52 F.3d at 468 (holding that, in case involving an
accident in Delta Airlines' baggage terminal, Delta "was required

to take all reasonable measures to ensure that [plaintiff's] trip to the baggage carousel was a safe one.") (citations omitted); Cruz v. New York City Transit Auth., 136 A.D.2d 196, 198, 526 N.Y.S.2d 827, 828 (2d Dep't 1988) ("[A] common carrier is required to exercise reasonable or ordinary care, in view of the dangers to be apprehended, providing and maintaining safe and adequate stairways in its stations.").

As for the second element of plaintiff's negligence claim, however, defendants contend that plaintiff has failed to provide sufficient evidence that American breached its duty to act reasonably under the circumstances. Specifically, defendants contend that: (1) plaintiff has failed to establish that a dangerous or defective condition existed in the aircraft or aisle; and (2) assuming that a defective condition existed, plaintiff has failed to establish that American had actual or constructive notice of this condition. (See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") at 1-19.) Plaintiff counters that there is sufficient evidence of a defective condition at the time and place of the incident and that American had constructive notice, since the allegedly hazardous condition existed for a sufficient length of time. (See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") at 6-17.)

Under New York law, in order to establish a prima facie

negligence claim, a plaintiff must be able to show specific facts establishing a "defect" that caused the accident and resulting injury. See Robbins v. K-Mart Corp., 248 A.D.2d, 867, 868, 669 N.Y.S.2d 774, 775 (3d Dep't 1998). Defendants argue that the record is inconsistent as to what plaintiff believed she tripped over. When plaintiff first commenced this action, she alleged that the cause of her fall was an unspecified "raised and defective condition" that was covered with large pieces of tape. However, at her deposition, plaintiff testified that there was no duct tape present in the area of her fall and that she did not know what she tripped over. Furthermore, Mr. Keyes testified that he had his back to the plaintiff when she fell and did not see what precipitated his wife's fall. Nonetheless, in opposition to defendant's summary judgment motion, plaintiff points out that in her deposition, she testified that she "felt" a raised strip that caught her foot and caused her to trip and fall. Plaintiff's husband also testified that upon boarding the airplane, he saw a raised metal strip at the area where his wife fell and that when his wife fell, her feet were in the immediate area of the raised strip. Although the inconsistencies in the record raise questions as to the existence of a defect, viewing the facts in the light most favorable to plaintiff, it is assumed for purposes of this motion that a raised strip on the floor —

possibly a seat mounting track, as Manning speculated — caused plaintiff's fall.

Turning to the second element of plaintiff's negligence claim, in New York, "in order to impose liability upon a landowner for injuries resulting for an allegedly defective condition, the plaintiff must establish that the landowner either created, or had actual or constructive notice of the defective condition." See Freeman v. Cobos, 659 N.Y.S.2d 424, 240 A.D.2d 698 (2d Dep't 1997) (citing Gordon v. Am. Museum of Natural History, 492 N.E.2d 774, 67 N.Y.2d 836, 501 N.Y.S.2d 646 (1986)). "Actual notice may be found where the defendant created the condition, or was in fact aware of its existence prior to the accident." Pianforni v. Kelties Bum Steer, 258 A.D.2d 634, 635, 685 N.Y.S. 2d 804, 805 (2d Dep't 1999). Constructive notice requires that "a defect . . . be visible and apparent and . . . exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." Bernard v. Waldbaum, Inc., 232 A.D.2d 596, 597, 648 N.Y.S.2d 700, 701 (2d Dep't 1996) (quoting Gordon, 67 N.Y.2d at 837, 501 N.Y.S.2d at 646, 492 N.E.2d at 774). Plaintiff has the burden of presenting evidence proving that "a defendant created the condition or that there was a reasonable opportunity to remedy the situation." Torri v. Big V of Kingston, Inc. 147 A.D.2d 743, 744, 537 N.Y.S.2d 629, 630 (3d Dep't 1989).

18

Notwithstanding defendants' lengthy arguments regarding
their actual or constructive notice of the condition which
allegedly caused plaintiff's fall, defendant American Airlines,
Inc. is admittedly "the sole entity responsible for the
maintenance and repair of its fleet of commercial aircraft."  <u>See</u>
Defs.' Mem. at 1 n.1.[2]  As such, assuming arguendo that the seat
mounting track caused plaintiff's fall and was not covered at the
time of the incident, it is clear that American Airlines created
and, therefore, had actual notice of the condition at issue.

However, even if the exposed seat mounting track caused the
accident and American Airlines created the alleged defect by
failing to cover it, plaintiff, nonetheless, fails to raise a
triable issue of fact as to the third element of her negligence
claim - i.e., whether the missing cover was a proximate cause of
the accident.  Even if this court were to accept Manning's
opinion that "[i]f the seat mounting track cover was missing as
described by the Keyes, this would be the more likely source for
initiating the trip,"  Manning still admits that "[n]o physical
evidence is available to confirm [the Keyes'] statements" and
"[a]n individual <u>could still possibly trip with the cover in</u>

_____

[2] In the same footnote, defendants state that the remaining
defendants AMR Corporation and American Eagle Holding Corporation
do not operate or control any of American Airlines' aircraft,
which consequently renders them improper parties to this action.
Plaintiff has not countered this allegation.  Accordingly,
plaintiffs' claims against these two defendants are dismissed.

<u>place</u> . . . ." (Torno Decl., Ex. J) (emphasis added).

Plaintiff's allegations that a metal strip or a seat mounting

track – whether covered or uncovered – was dangerous or defective

primarily because she tripped on it is unduly speculative and,

therefore, cannot render American liable for her alleged injury.

<u>See, e.g.</u>, <u>Anilus v. Gail Realties</u>, 206 A.D.2d 446, 447, 614

N.Y.S.2d 551, 552 (2d Dep't 1994) (holding that plaintiff's

unsupported allegation that an "entire trap door" was

unreasonably dangerous was insufficient to raise an issue of fact

as to whether trap door was built in an unsafe manner or violated

existing statutory or administrative safety standards); <u>Varrone</u>

<u>v. Dinaro</u>, 209 A.D.2d 508, 509, 619 N.Y.S.2d 79, 80 (2d Dep't

1994) (granting defendant's summary judgment motion where

plaintiff alleged that the stairway on which he fell was

dangerous and defective, but "was unable to state what had caused

him to slip" on that stairway); <u>Brown v. Weinreb</u>, 183 A.D.2d 562,

562-63, 583 N.Y.S.2d 460, 461 (1st Dep't 1992) (dismissing

complaint where there was no evidence that a trap door through

which plaintiff fell was unsafely built or was in a negligent

condition).  More significantly, according to American's records

for the two-year period before plaintiff's fall, there were no

reported incidents of similar falls in the aisle of all 767

aircraft which involved seat mounting tracks. (<u>See</u> Torno Decl.,

Ex. K.)  Furthermore, plaintiff has failed to submit any evidence

that this strip was improperly designed, built, maintained, managed, controlled or repaired. As defendants note, there is also no evidence which demonstrates that the strip or seat mounting track deviated from relevant industry standards or regulations.

## Conclusion

For the reasons stated, the complaint against AMR Corporation and American Eagle Holding Corporation is dismissed. American Airlines, Inc.'s motion for summary judgment is granted. The Clerk of Court is directed to close the case.

Dated: Brooklyn, New York
       November 30, 2006

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge